IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOE HAND PROMOTIONS, INC., | : | No. 4:12-cv-01874 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| LARRY W. TICKLE, JR., et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

February 2, 2016

This piracy case involving the interception of an Ultimate Fighting Championship program by a small Northumberland County, Pennsylvania bar and its officers is now before the Court on Plaintiff's Motion for Default Judgment. In consideration of the Default Judgment hearing held before this Court on December 3, 2015, Plaintiff's Motion is granted. Consistent with the foregoing discussion, Plaintiff is awarded $1,200 in statutory damages, $3,600 in enhanced damages, and $7,850.66 in fees and costs, for a total award of $12,650.66.

## I.     BACKGROUND

Because Defendants in this action have not filed an answer, responsive motions, or briefs, the following background material is taken from Plaintiff Joe

Hand Promotions, Inc.'s Complaint.[1] Cafe Bellisimo, Inc. is a business corporation headquartered at 394 Queen St. Northumberland, Northumberland County, Pennsylvania.[2] It was created on May 25, 2001, according to the Pennsylvania Department of State.[3] Joe Hand Promotions alleges that Cafe Bellisimo owns and operates the commercial establishment doing business as Fatty McDaddy's a/k/a Datty McFatty's, a small restaurant and pub located at 95 Queen Street, Northumberland, Pennsylvania.[4]

According to Plaintiff's Complaint, Larry W. Tickle, Jr. is one of the two individuals (the other being former co-Defendant Jason R. Letteer) specifically identified on the Pennsylvania Liquor Control Board license issued for the bar.[5] Mr. Tickle and Mr. Letteer were also corporate officers for Cafe Bellisimo, Inc., the entity that owned and operated Daddy McFatty's.[6]

Plaintiff Joe Hand Promotions, Inc. is a Pennsylvania corporation with its principal place of business located at 407 E. Pennsylvania Blvd., Feasterville, Bucks County, Pennsylvania.[7] According to the company's website, Joe Hand Promotions was founded in 1970 by Joe Hand Sr. and his family.[8] It claims to be

---

[1] ECF No. 1.
[2] Id. at 2.
[3] Id. at 3.
[4] Id.
[5] Id.
[6] Id.
[7] Id. at 2.
[8] http://www.joehandpromotions.com/about-us/

"the nation's premier TV distributor of closed-circuit and pay-per-view special events for commercial establishments" with a customer base that includes "thousands of sports bars, restaurants, casinos, military bases, universities, cruise ships and oil rigs."[9]

Plaintiff's Complaint alleges that on the evening of Saturday, September 25, 2010, Mr. Tickle and Mr. Letteer specifically directed the employees of Daddy McFatty's to unlawfully intercept and broadcast to their bar's patrons a nationwide mixed-martial arts fight to which Plaintiff owned the exclusive pay-per-view distribution rights.[10] The allegedly bootlegged program was entitled Ultimate Fighting Championship (UFC) 119: Frank Mir v. Mirko Cro Cop and was broadcast live from Indianapolis, Indiana. UFC 119 included at least eleven different mixed-martial arts fights, headlined by the match between Mir and Cro Cop.[11] According to a "rate card" submitted by Plaintiff, the cost for an establishment such as Defendant's to purchase and show the UFC program through Plaintiff would have been $900.00.[12]

According to Joe Hand, Jr., the President of Joe Hand Promotions, Inc., his company retains auditors and law enforcement personnel to detect and identify

---

[9] Id.
[10] ECF No. 1 at 4.
[11] Id. at 5.
[12] ECF No. 47 Ex. 4 at 27.

piracy.[13] In support of its Motion for Default Judgment, Plaintiff submits the sworn affidavit of Jason M. Hannum, an investigator with the private investigative agency MB Scurto & Associates.[14] According to Mr. Hannum, he entered Daddy McFatty's on September 25, 2010 at approximately 10:05 p.m. and witnessed the establishment broadcasting the UFC 119 program.[15] Mr. Hannum also ordered a rum and coke from a bartender named John before exiting the establishment approximately a half hour later.[16] Mr. Hannum's affidavit includes photos and specific details about the bartender, the building, and even the license plates of the cars parked in the bar's lot that night.[17] According to Hannum, three separate head counts indicated the presence of twenty (20) patrons in Defendant's establishment on the night in question.[18]

Mr. Hand testified in an affidavit in support of his company's Motion for Default Judgment that Plaintiff did not have an agreement with Mr. Tickle, Cafe Bellissimo, or Daddy McFatty's to show the UFC program in question. Mr. Hand elaborates on certain features of pay-per-view piracy disputes, including the rise in such piracy in recent years, the negative effects it has had on his business, and the

---

[13] ECF No. 47 Ex. 4 at 2–3.
[14] ECF No. 47 Ex. 3.
[15] Id. at 1.
[16] Id.
[17] Id.
[18] Id. at 2.

reasons why such piracy cannot be accomplished accidentally.[19]

As a matter of this case's initial procedural history, Plaintiff's Complaint was filed in September of 2012, and Defendants failed to answer. Default was entered against all Defendants on May 10, 2013.[20] The development of the case's procedural posture from that point on is more tortuous than that of the ordinary case that has arrived on a default judgment motion. Specifically, default against Mr. Letteer was set aside in accordance with this Court's March 17, 2014 Memorandum and Order, which found that Mr. Letteer could raise a "meritorious defense" based on his apparent lack of involvement with Daddy McFatty's since as early 2006.[21] That involvement was later put at issue again by Plaintiff who alleged that certain corporate filings and liquor license registrations still indicated Mr. Letteer had "active" status as late as 2011.[22] Plaintiff later stipulated to the dismissal with prejudice of all of its claims against Mr. Letteer on July 8, 2014.[23] Mr. Letteer is therefore no longer a party to this action.

With regard to Defendant Larry W. Tickle, Jr., Plaintiff filed a Motion for Default Judgment against him individually and doing business as Daddy McFatty's on July 17, 2014 following the dismissal of Mr. Letteer.[24] The parties reached an

---

[19] See ECF No. 47 Ex. 4.
[20] ECF No. 12.
[21] ECF Nos. 22–23.
[22] See ECF No. 27.
[23] ECF No. 35.
[24] ECF No. 38.

agreement dismissing the claims without prejudice on January 6, 2015.[25] Plaintiff filed a Motion to Reopen on January 21, 2015, indicating that Mr. Tickle had refused to comply with the terms of the parties' settlement agreement.[26] This Court granted the Motion and held a telephone status conference on September 8, 2015, at which time Mr. Tickle informed the Court that he was unable to comply with the settlement agreement and that he would like to "have his day in court" before the case was disposed of. This Court encouraged Plaintiff to renew its Motion for Default Judgment, which it did, and thereafter held a default judgment hearing on December 3, 2015.[27]

## I.    LAW

Federal Rule of Civil Procedure 55 provides in pertinent part:

**(a) Entering a Default.**

> When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

**(b) Entering a Default Judgment.**

> (1) By the Clerk. If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due— must enter judgment for that amount and costs against a defendant

---

[25] ECF Nos. 41–42.
[26] ECF Nos 43–44.
[27] ECF No. 48.

who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

(2) By the Court. In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:

    (A) conduct an accounting;
    (B) determine the amount of damages;
    (C) establish the truth of any allegation by evidence; or
    (D) investigate any other matter.

It is important to note that a hearing is never required under Rule 55(b)(2). As Wright and Miller explain at § 2684, Rule 55(b)(2) grants the court "discretion to decide whether to enter a judgment by default" and "empowers the district judge to hold hearings . . . as it deems necessary and proper." Those exceptional circumstances are set out and listed above in Fed. R. Civ. P. 55(b)(2)(A)–(D). The most important consideration historically has been the preservation of a right to a jury trial where that right is statutorily guaranteed. Relatedly, Wright and Miller explain that courts often find it beneficial to hold a narrow, trial-like hearing in the event that the defendant contests the amount of damages.

As the United States Court of Appeals for the Third Circuit has stated:

A consequence of the entry of a default judgment is that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure, § 2688 at 444 (2d ed. 1983). If the damages are not for a "sum certain or for a sum which can by computation be made certain," Fed. R. Civ. P. 55(b)(1), the court may conduct such hearings or order such references as it deems necessary and proper. Fed. R. Civ. P. 55(b)(2).[28]

Six years earlier, Judge Arlin M. Adams, writing for the Third Circuit, explained:

It is well settled in this Circuit that the entry of a default judgment is left primarily to the discretion of the district court. As Justice Harlan explained in the parallel context of sanctions for failure to prosecute a claim, a trial court's discretion to dismiss a complaint is a power of "ancient origin" that "has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[29]

The Third Circuit has also enumerated a set of factors for district courts to consider when imposing judgment for failure to prosecute or answer in a variety of circumstances. Those factors, which the Third Circuit has referenced in the default and default judgment contexts, are commonly referred to as the <u>Poulis</u> factors and tally six in number:

(1)    the extent of the party's personal responsibility;

---

[28] <u>Comdyne I, Inc. v. Corbin</u>, 908 F.2d 1142, 1149 (3d Cir. 1990).

[29] <u>Hritz v. Woma Corp.</u>, 732 F.2d 1178, 1180 (3d Cir. 1984) (citing <u>Tozer v. Charles A. Krause Milling Co.</u>, 189 F.2d 242, 244 (3d Cir.1951) and quoting <u>Link v. Wabash Railroad Co.</u>, 370 U.S. 626, 629–31 (1962)).

(2)     the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;

(3)     a history of dilatoriness;

(4)     whether the conduct of the party of the attorney was willful or in bad faith;

(5)     the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and

(6)     the meritoriousness of the claim or defense.[30]

"Before entering a default judgment, a court must consider a number of factors. The Third Circuit . . . has condensed these factors into three main issues: (i) whether the plaintiff will be prejudiced if the default is denied, (ii) whether the defendant has a meritorious defense; and (iii) whether the default was the product of defendant's culpable conduct."[31]

"Considerable delays, especially those that might "stretch on indefinitely, are sufficient to show prejudice to the plaintiff."[32] Moreover, " the defendant's failure or refusal to engage[ ] in the litigation process and [to] offer[ ] no reason for this failure or refusal may qualif[y] as culpable conduct with respect to the entry of

---

[30] Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 919 (3d Cir. 1992) (quoting Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 868 (3d Cir. 1984)).

[31] E. Elec. Corp. of New Jersey v. Shoemaker Const. Co., 657 F. Supp. 2d 545, 551 (E.D. Pa. 2009).

[32] Yakubets, 3 F. Supp. 3d at 271 (citing Grove v. Rizzi 1857 S.P.A., No. 04–2053, 2013 WL 943283, at *2 (E.D.Pa. Mar. 12, 2013)).

a default judgment—indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative."[33]

## III.   ANALYSIS

There are two pertinent provisions under which Plaintiff seeks damages in this case: 47 U.S.C. §§ 553(c)(3)(A)(ii) and 553(c)(3)(B). The former deals with general statutory damages, the latter institutes an enhanced damages multiplier. Plaintiff also appeals to § 553(c)(2)(C) for the award of fees and costs. 47 U.S.C. §§ 553 reads as follows:

### 47 U.S.C. § 553. Unauthorized Reception of Cable Service

(a) Unauthorized interception or receipt or assistance in intercepting or receiving service; "assist in intercepting or receiving" defined

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

(b) Penalties for willful violation

---

[33] Yakubets, F. Supp. 3d at 272 (citing E. Elec. Corp. of N.J. v. Shoemaker Constr. Co., 657 F.Supp.2d 545, 554 (E.D.Pa.2009)).

(1) Any person who willfully violates subsection (a)(1) of this section shall be fined not more than $1,000 or imprisoned for not more than 6 months, or both.

(2) Any person who violates subsection (a)(1) of this section willfully and for purposes of commercial advantage or private financial gain shall be fined not more than $50,000 or imprisoned for not more than 2 years, or both, for the first such offense and shall be fined not more than $100,000 or imprisoned for not more than 5 years, or both, for any subsequent offense.

(3) For purposes of all penalties and remedies established for violations of subsection (a)(1) of this section, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation.

(c) Civil action in district court; injunctions; damages; attorney's fees and costs; regulation by States or franchising authorities

(1) Any person aggrieved by any violation of subsection (a)(1) of this section may bring a civil action in a United States district court or in any other court of competent jurisdiction.

(2) The court may–

(A) grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section;

(B) award damages as described in paragraph (3); and

(C) direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails.

(3)(A) Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:

(i) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

(B) In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000.

(C) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100.

(D) Nothing in this subchapter shall prevent any State or franchising authority from enacting or enforcing laws, consistent with this section, regarding the unauthorized interception or reception of any cable service or other communications service.

In light of the following discussion, the Court holds that Plaintiff is awarded $1,200 in statutory damages, $3,600 in enhanced damages, and $7,850.66 in fees and costs, for a total award of $12,650.66.

**A.      Plaintiff Is Awarded $1,200 In Statutory Damages.**

Though the original Complaint sought damages in excess of $170,000.00 for violations of 47 U.S.C. § 605; 47 U.S.C. § 553; and Pennsylvania tort law in the form of an action for conversion, the renewed Motion for Default Judgment seeks damages only for violations of 47 U.S.C. §§ 553(c)(3)(A)(ii) and 553(c)(3)(B) in the amounts of $3,000 and $20,000, respectively, as well as for attorney's fees pursuant to 47 U.S.C. § 553(c)(2)(C).

This is likely the result of similar prior cases, such as Joe Hand Promotions, Inc. v. Becchetti, written by the Honorable Malachy E. Mannion of this Court in 2013, which termed a $111,100.00 damages request by Plaintiff in similar circumstances as "so grossly disproportionate to the alleged wrong and underlying circumstances that it has the effect of completely undercutting the credence of the plaintiff's arguments."[34] Judge Mannion went on to discredit the tort conversion theory as well, noting that it was unsupported by Pennsylvania law because intangible property must be "merged with" or "otherwise connected to a document" before it may form the basis of conversion action.

In addition, a very extensive treatment of 47 U.S.C. §§ 553 and 605 was afforded in a similar decision written by the Honorable Gene E. K. Pratter of the United States District Court for the Eastern District of Pennsylvania. In that case, Joe Hand Promotions, Inc. v. Yakubets, Judge Pratter also dealt with a Motion for

---

[34] Joe Hand Promotions, Inc. v. Becchetti, No. 12-CV-1242, 2013 WL 4520638, at *1 (M.D. Pa. Aug. 26, 2013).

Default Judgment followed by a renewed Motion for Default Judgment.[35]  Judge

Pratter's analysis, in a published decision whose unfavorable underlying tenor

directed to Plaintiff here, is important for our purposes because it addresses

application of § 553, calculation of damages, and the existence of vicarious

liability for § 553 piracy offenses at private establishments.

"[W]here a plaintiff's complaint pleads claims under both §§ 553 and 605,

but at the default judgment stage the plaintiff can prove neither with individual

specificity, then § 553 will be applied."[36] "A presumption in favor of § 553 is the

more principled and persuasive approach."[37] Plaintiff concurs with this approach in

its brief.[38] Accordingly, the Court recognizes that § 553 is the appropriate statutory

provision to apply in this context.

Based on the allegations in Plaintiff's Complaint as well as the factors set

forth by the Third Circuit, the entry of default judgment is proper here. First,

Plaintiff will suffer prejudice if default is refused not only because it will be denied

of the instant fee that Defendant's establishment should have paid, but it will also

not obtain a judgment of any deterrent force. Second, Defendant has not offered a

meritorious defense. Given that Mr. Tickle was an owner and operator of the

establishment in question, any argument as to lack of knowledge or lack of

---

[35] Joe Hand Promotions, Inc. v. Yakubets, 3 F. Supp. 3d 261, 266 (E.D. Pa. 2014).

[36] Joe Hand Promotions, Inc. v. Yakubets, No. CIV.A. 12-4583, 2013 WL 5224123, at *4 (E.D. Pa. Sept. 17, 2013).

[37] Id.

[38] ECF No. 47 Ex. 1 at 4–5.

involvement in the scheme is rendered inefficacious by fundamental notions of vicarious liability.[39]  Lastly, piracy of a pay-per-view event at the establishment that one owns and operates is necessarily a culpable act, even if committed indirectly or through an agent.[40]

In calculating statutory damages, § 553(c)(3)(A)(i)–(ii) provide that district courts should follow either of the following approaches:

(i)     the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(ii)    the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

"If the plaintiff issued a card listing rates for its programming (e.g., segmented by the capacity of the establishment), this number can be easily determined and can form the basis for the statutory damages award."[41]  In addition, the court might consider "any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages."[42]

---

[39]  See Yakubets, 3 F. Supp. 3d at 271–72.
[40]  See id.
[41]  Id. at 279.
[42]  Id at 280.

15

Thus, the statutory damages calculation outlined in § 553(c)(3)(A)(i) anticipates a statutory award with two components: (i) the sum-certain rate from the rate card and (ii) a reasonable estimates of the profits attributable to the violation. [43]

As in <u>Yakubets</u>, "[e]xistence of a rate card "makes estimating actual damages straightforward as an initial matter" in § 553 cases.[44] Here, Plaintiff's well-pleaded Complaint, its Motion for Default Judgment, and its supporting exhibits indicate that the applicable rate to broadcast the program at issue for an establishment of Defendant's capacity would have been $900.00 on the night in question.[45] Thus, the Court will use the sum-certain rate of $900.00 as the first component of its award of statutory damages.

By its nature, the second component of the statutory award—the profit component—necessitates a more nebulous calculation, an estimation of sorts. The <u>Yakubets</u> court enumerated the following factors a district court might consider when estimating profits:

> (1) the size of the establishment; (2) the number of patrons at the establishment, taken, to the extent possible, as the number of patrons present because of the interception (to which evidence of advertising to attract customers may be relevant); (3) the number, size, and position of screens displaying the broadcast (a factor to be considered in conjunction with (1) and (2) as an indication of who might be there specifically to watch); (4) any cover charge levied because of the interception; (5) what additional money patrons spent because of the

---

[43] <u>See</u> <u>id.</u> at 280–81.
[44] <u>Yakubets</u>, 3 F. Supp. 3d at 280–81.
[45] <u>See</u> ECF No. 47 Ex. 4 at 27. <u>See also</u> ECF No. 47 Ex. 1 at 12–13.

interception (i.e., the amounts spent by those who otherwise would not have come, plus any other premiums or greater spending by those who would have come anyway); and (6) any such other factors as may appear relevant in the case before the court.[46]

Where such a discretionary exercise is involved, the Court finds it reasonable to hue closely to the methodology employed by federal courts in this and neighboring districts within the Third Circuit's venire. Thus, the Court will follow the profit approximation approach set forth in Yakubets. Specifically, the Court will award a reasonable profit margin to Plaintiff based upon an estimated revenue figure, the number of patrons recorded in Defendant's establishment during the night in question, and the assumption that one-half (50%) of the patrons would have purchased menu items.

"[G]iven Joe Hand's inability to take discovery, the Court will assume that (a) half of the individuals present came solely because of the show and (b) each spent $20 on food and drink, . . . and, further, that (c) the remaining half each spent $10 more than they otherwise would have because they stayed longer to watch the Match."[47] "These are generous allowances given the lack of evidence; their foundation on revenue rather than profit; and the fact that without evidence of damages, courts often award only the sublicense fee from the rate card."[48]

Applied to the instant case, there were 20 patrons in Defendant's

---

[46] Yakubets, 3 F. Supp. 3d 280.
[47] Yakubets, 3 F. Supp. 3d at 281.
[48] Id.

establishment on the night in question. Assuming that half of the individuals (10)

came solely because of the show and that half spent $20 on food on drink, with the

remaining half (10) spending $10 on food and drink, Plaintiff here is entitled to in

an increase in statutory damages in the amount of $300.[49] Thus, Plaintiff is

awarded $1,200 in statutory damages.[50]

### B.    Plaintiff Is Awarded $3,600 In Enhanced Damages.

"Congress focused on deterrence in enacting § 553(c)(3)(B),  which, by its

plain terms, triggers the court's discretion to increase actual or statutory damages

by up to $50,000 if the violation was committed (a) 'willfully' and (b) 'for

purposes of commercial advantage or private financial gain.'"[51] "Once they have

met those conditions, this Court has the discretion to impose increased damages."[52]

First, "willfulness for purposes of § 553(c)(3)(B)'s enhanced damages

requires both the defendant's intentional signal interception as well as knowledge

of or reckless disregard as to the unlawfulness of its signal interception."[53] "[A]s

courts have consistently held in other contexts, such willfulness may be proved by

circumstantial evidence."[54] Although applying this standard of willfulness in the

default judgment context, absent discovery, poses certain barriers as to a court's

---

[49] (10 * $20) + (10 * $10) = $200 + $100 = $300.
[50] $900 + $300 = $1,200.
[51] Yakubets, 3 F. Supp. 3d at 282 (citing 47 U.S.C. § 553(c)(3)(B)).
[52] Comcast of S. New England, Inc. v. Kacavas, No. CIV.A.07CV10780-NG, 2007 WL 4556685, at *2 (D. Mass. Dec. 18, 2007).
[53] Yakubets, 3 F. Supp. 3d at 284.
[54] Id. at 285.

ascertaining the exact facts of a dispute, an inference of willfulness may be drawn based upon the very nature of piracy offenses.[55] As such, the Court acknowledges that "the likelihood of a violation's being intentional and, further, its likelihood of being knowingly illegal, suffices to establish a presumption of willfulness for the purposes of pleading, and, thus, default judgment."[56]

The second requirement for enhanced damages—that the Defendant have acted "for purposes of commercial advantage or private financial gain"—is "satisfied by a broad set of circumstances."[57] For instance, where "the intercepted signal was shown at a restaurant as an inducement for patrons to purchase food and beverages, the Court has no difficulty finding that the violation was made for the [ ] purposes . . . 'of commercial advantage or private financial gain.'"[58] "Further, because Defendants displayed the Broadcast at their place of business, the Court may infer that Defendants' conduct was "for the purposes of direct or indirect commercial advantage or indirect pecuniary gain," rather than for enjoyment by private parties at home."[59]

The Court has no difficulty finding, based upon the averments made in Plaintiff's Complaint, that Defendant's violation of § 553 was willful and

---

[55] See id.
[56] See id. at 288.
[57] Id. at 289.
[58] Joe Hand Promotions, Inc. v. Patton, No. CIV.A. 10-40242-FDS, 2011 WL 6002475, at *4 (D. Mass. Nov. 29, 2011).
[59] Joe Hand Promotions, Inc. v. Waldron, No. CIV. 11-849 RBK/KMW, 2013 WL 1007398, at *3 (D.N.J. Mar. 13, 2013).

calculated to bring about commercial advantage or private gain. As the <u>Yakubets</u> court recognized and the affidavit of Plaintiff's President, Joe Hand, Jr. emphasizes, due to the nature and security of modern pay-per-view programming, "accidental interception" in cases such as this one is "highly unlikely."[60] Taking as true the factual allegations of Plaintiff's Complaint, Defendant's interception of the UFC pay-per-view program was necessarily committed intentionally for the purposes of augmenting his patrons and therefore, his profits.

Moreover, insofar as the enhanced damages calculation seeks to impart a sort or general or specific deterrence, the Court is aware of and deems its award necessary to counter, as Mr. Hand emphasizes, the numerous "detrimental effect[s] upon lawful residential and commercial customers," including increased prices and a decreased tax revenue base.[61] I am also mindful of the ill-gotten cost advantage a pirating establishment may reap relative to a lawful establishment that pays its due price for broadcasting one of Plaintiff's programs. In light of these considerations in addition to well-pled averments in Plaintiff's Complaint, I deem it appropriate to award enhanced damages in this matter.

Enhanced damages under § 553 are typically calculated as a multiple of the base statutory damages.[62] Thus, the Court must discern the appropriate multiple for

---

[60] <u>See</u> <u>id.</u> at 288. <u>See</u> <u>also</u> ECF No. 47 Ex. 4 at 3–4.
[61] ECF No. 47 Ex. 4 at 6.
[62] <u>See</u> <u>Yakubets</u>, 3 F. Supp. 3d at 290.

this particular case and this particular level of infringement. "The application to the actual or statutory damages award of a simple multiplier, the value of which may be adjusted as the case demands, best achieves the dual goals of general and specific deterrence."[63]

The standard multiplier in these cases is three (3) times the statutory award.[64] Moreover, a multiplier of three is well calculated to achieve deterrence while avoiding unnecessarily punitive consequences in disputes involving an offender's first offense or a miniscule number of pirated programs. As several courts have quipped, a multiplier of three is warranted where, so to speak, the offender is not "the Blackbeard of pirates."[65]

There was no evidence presented in the Complaint or during the Court's default judgment hearing to suggest that Defendant's act of piracy was a minor first offense that has not recurred since the date in question. No evidence was presented suggesting that Defendant's establishment consistently engaged in the type of piracy at issue or that the conduct of its officers on the night in question was in any way representative of the establishment's usual protocol. That being said, the Court appreciates the arguments as to the need for deterrence and the detrimental effects of such piracy made on behalf of Plaintiff during the Court's

---

[63] Id.

[64] Id. at 291 n. 48 (collecting cases).

[65] Id. at 291 (quoting Joe Hand Promotions, Inc. v. Streshly, 655 F.Supp.2d 1136, 1139 (S.D.Cal.2009)).

default judgment hearing. Accordingly, weighing all of these considerations, the Court decides that a multiplier of three is appropriate and no more excessive than necessary to ascertain the requisite levels of general and specific deterrence. The Plaintiff is therefore awarded $3,600 in enhanced damages under § 553(c)(3)(B), for a total of $4,800 in statutory and enhanced damages.[66]

## C.   Plaintiff Is Awarded $7,850.66 In Fees And Costs.

In <u>Alyeska Pipeline Service Co. v. Wilderness Society</u>, the Supreme Court of the United States reaffirmed the "American Rule," namely that each party in a lawsuit pays its own attorney's fees.[67] However, an exception to the American Rule exists where statutory authority provides for the awarding of fees to the prevailing party.[68] In this instance, § 553(c)(2)(C) permits the court to "direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails."

To merit an award of attorney's fees here, Plaintiff must first establish that it was the "prevailing party."[69] Once it is established that the plaintiff prevailed, the court must determine reasonable fees under the lodestar formula: the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly

---

[66]  $1,200 * 3 = $3,600. $1,200 + $3,600 = $4,800.
[67]  421 U.S. 240 (1975).
[68]  <u>Beattie v. Line Mountain Sch. Dist.</u>, No. 4:13-CV-02655, 2014 WL 3400975, at *1 (M.D. Pa. July 10, 2014) (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429 (1983)).
[69]  <u>Hensley</u>, 461 U.S. at 433. <u>See also</u> <u>Brytus v. Spang & Co.</u>, 203 F.3d 238, 242–43 (3d Cir.2000).

rate."[70] "The amount of the fee, of course, must be determined on the facts of each case."[71]

"The party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable."[72] "To meet its burden, the fee petitioner must 'submit evidence supporting the hours worked and rates claimed.'"[73] Once the fee petitioner meets this <u>prima facie</u> burden, "the party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."[74]

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation."[75] "The district court should exclude hours that are not reasonably expended."[76] "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary."[77]

"After determining the number of hours reasonably expended, the district court must examine whether the requested hourly rate is reasonable."[78] "Generally, a reasonable hourly rate is to be calculated according to the prevailing market rates

---

[70] <u>Hensley</u>, 461 U.S. at 433; <u>Pennsylvania v. Delaware Valley Citizens' Council for Clean Air</u>, 478 U.S. 546, 554 (1986); <u>Maldonado v. Houstoun</u>, 256 F.3d 181, 184 (3d Cir.2001).
[71] <u>Hensley</u>, 461 U.S. at 429–30.
[72] <u>Rode v. Dellarciprete</u>, 892 F.2d 1177, 1183 (3d Cir.1990) (Nygaard, J.).
[73] <u>Id.</u> (quoting <u>Hensley</u>, 461 U.S. at 433).
[74] <u>Rode</u>, 892 F.2d at 1183.
[75] <u>Hensley</u>, 461 U.S. at 433.
[76] <u>Rode</u>, 892 F.2d at 1183.
[77] <u>Id.</u>
[78] <u>Id.</u>

in the relevant community."[79] This "forum rate rule" dictates that, generally "an 'out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged.'"[80]

The forum rate rule is subject to two exceptions: "first, when the need for the special expertise of counsel from a distant district is shown; and, second, when local counsel are unwilling to handle the case." [81]"Thus, when a party can show that it qualifies for either exception, the Court may award attorney fees based on prevailing rates in the community in which the parties' attorneys practice."[82]

Turning its attention back to the § 553 context, this Court notes as a threshold matter that it is fully of aware of the potential dangers associated with overuse of fee award provisions, particularly in cases of rote prosecutions that often do not proceed beyond the default judgment stage.  Specifically, as other federal courts have indicated, I must be cautious not to impose fees on unsuspecting (often pro se) litigants where such an award is unwarranted. In particular, I am aware of other federal cases brought by Plaintiff in which courts have refused to award fees due to boilerplate filings, improper accounting of hours,

---

[79] Id. (citing Blum v. Stenson, 465 U.S. 886, 895 (1984)).
[80] Interfaith Cmty. Org. v. Honeywell Intern., Inc., 426 F.3d 694, 704 (3d Cir.2005) (Becker, J.) (quoting Report of the Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 261 (1986)).
[81] Honeywell, 426 F.3d at 705 (internal quotations and citations omitted).
[82] Id.

or other similar deficiencies.[83] Those deficiencies are not present here. To the

contrary, an award of fees is warranted based upon the underlying violation as well

as the procedural posture of this case.

Even absent statutes providing for such an award, it has long since been the

case that a prevailing party is entitled to fees where the opposing party's conduct

was vexatious or in a reasonably calculated to delay the administration of justice.[84]

The Court would thus distinguish the instant matter from earlier cases refusing to

award fees to Plaintiff on the basis of its drawn-out procedural history, a

consequence largely of Defendant's reneging on the parties' settlement agreement.

In addition to the extra cost imposed upon Plaintiff as a result of Defendant's

refusal to comply with the terms of the settlement agreement, the Court and the

public were also forced to incur significant expense of time and resources as a

result of the re-opening of this largely run-of-the-mill piracy action. Such dilatory

conduct also contravenes amended Federal Rule of Civil Procedure 1, which now

provides that the federals rules be "<u>employed by the court and the parties</u> to secure

the just, speedy, and inexpensive determination of every action and proceeding."

---

[83] <u>See, e.g.</u>, <u>Joe Hand Promotions, Inc. v. Be</u>, No. 11-CV-01333-LHK, 2011 WL 5105375, at *7 (N.D. Cal. Oct. 26, 2011); <u>Joe Hand Promotions, Inc. v. Becchetti</u>, No. 12-CV-1242, 2013 WL 4520638, at *1 (M.D. Pa. Aug. 26, 2013).

[84] <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45 (1991) (quoting <u>Alyeska</u>, 421 U.S. at 259). <u>See also</u> <u>F. D. Rich Co. v. U. S. for Use of Indus. Lumber Co.</u>, 417 U.S. 116, 129 & n.17 (1974) (collecting cases) ("The federal judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation. We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.").

Turning to its calculation of the base lodestar amount of fees in this action, Plaintiff has submitted the following accounting of its fees and costs in this matter:

| Table 1. Plaintiff's Requested Fees and Costs | | | |
|---|---|---|---|
| **Employee** | **Rate** | **Hours** | **Total** |
| Admin. Assistant | $100.00 | 11.85 | $1,185.00 |
| John R. Brown, Esq. | $400.00 | 11.90 | $4,760.00 |
| Research Attorney | $300.00 | 4.00 | $1,200.00 |
| Thomas P. Riley, Esq. | $500.00 | 2.50 | $1,250.00 |
| Costs[85] | - | - | $1,499.16 |
| | | **Total** | **$9,894.16** |

The Court notes, as a threshold matter, that Plaintiff's requested rates are significantly higher than those reasonably paid in this forum, the Williamsport venire of the United States District Court for the Middle District of Pennsylvania. In fact, as recently as 2014, this Court reset the reasonable rate for this forum in Beattie v. Line Mountain School District.[86] I made the following rate calculations in Beattie based upon declarations and a study of prevailing market rates in my venire:

> The Court finds that a reasonable fee range in this vicinage for a partner with the necessary skill and experience to provide competent legal services in this type of litigation is in the range of $180 to $325 per hour. The Court considers the evident trial skill of attorney

---

[85]  Itemized at ECF No. 56 Ex. 2 at 11.
[86]  No. 4:13-CV-02655, 2014 WL 3400975, at *10 (M.D. Pa. July 10, 2014).

Fletman and the specific expertise of both attorneys Fletman and Fromson in fixing their rates at the high end of this range.

A reasonable rate in the Williamsport vicinage for attorney Fletman in this matter, and considering her skill and experience on these issues, is $325 per hour. Corresponding reasonable rates for her associate Bloom is $200 per hour and associate Kelley is $150 per hour.[87]

To the contrary, Plaintiff submits fee rates in the amount of $400.00 per hour for John R. Brown, Esquire, and $500.00 per hour for Thomas P. Riley. Those rates are unreasonable for the purposes of a fee award calculation following the prevailing Third Circuit lodestar formula and given this Court's binding rate setting in Beattie. Moreover, Plaintiff has not established either prong of the forum-rate rule exception. Namely, Plaintiff has not established that any particular expertise was required in prosecuting this case. Although the underlying subject matter involved digital piracy, the procedural track the dispute took never surpassed a garden-variety, pro se default judgment action. Second, Plaintiff submitted no affidavits from local counsel or related evidence supporting a claim that local counsel was unwilling to take the case. In fact, Mr. Brown, a regular practitioner in the Eastern District of Pennsylvania, was quite willing to step in for Mr. Riley for the purposes of the Court's in-person default judgment hearing. Accordingly, both Mr. Brown's and Mr. Riley's rates will be reduced to $325.00

---

[87] Id.

per hour.[88] The Court recognizes both attorneys' experience and skill in choosing a

rate at the high end of the forum's range.

Plaintiff also submits fee rates for a "Research Attorney" in the amount of

$300.00 per hour. No biographical or educational background is included for this

attorney in Plaintiff's papers. It is also unclear from Plaintiff's affidavit whether

the research attorney entries correspond to a single person or are merely general

labels for junior or part-time associates at Plaintiff's firm. The research attorney

may also be an independent contractor. That being said, Plaintiff's papers were

well composed, and the time log indicates that this was primarily a product of the

research attorney. In accordance with these considerations as well as the rates set

forth in <u>Beattie</u>, the research attorney time will be calculated at a $200.00 per hour

rate. Plaintiff also charges out his administrative assistant at $100.00 per hour.

According to this District's precedent and given the legal nature of the work

performed by the administrative assistant according to Plaintiff's fee bill, a

reasonable rate for an administrative assistant similar to Plaintiff's is $90.00 in this

venire of the Court.[89] The hourly rates submitted by Plaintiff will therefore be

---

[88] Plaintiff cites <u>J & J Sports Prods., Inc. v. Thomas</u>, No. CIV.A. 10-7051, 2011 WL 3156765, at *1 (E.D. Pa. July 26, 2011) for the proposition that its rates are reasonable. <u>Thomas</u>, an Eastern District of Pennsylvania case is not binding on this Court and nevertheless is only relevant to the question of whether Plaintiff's rates would be reasonable in the Philadelphia area. <u>Beattie</u>, not <u>Thomas</u>, is the relevant authority for the appropriate lodestar rate in the Williamsport vicinage of the Middle District of Pennsylvania.

[89] <u>See</u> <u>Walker v. Gruver</u>, No. 1:11-CV-1223, 2013 WL 5947623, at *5 (M.D. Pa. Nov. 5, 2013) (Conner, C.J.) (setting $90 per hour rate for law clerks, paralegals, and administrative

revised in accordance with the above calculations, consistent with this Court's

precedent.

Now having calculated the lodestar rates, the Court moves on to calculate

the hours expended by Plaintiff. The Court finds Plaintiff's hours very detailed and

reasonable given the procedural posture of this case. The Court will reduce Mr.

Riley's time by 0.60 hours for four 0.15-hour entries that were exactly duplicative

of four of his administrative assistant's entries. Those four duplicative entries of

Mr. Riley's, which I now strike, were logged on the exact same four days as his

administrative assistant's entries. Because the administrative assistant's fees

already account for these four entries, it would be duplicative to also award fees for

Mr. Riley's performance of the same four administrative tasks. In the Court's

judgment, no other deductions are appropriate, and Plaintiff's request was

reasonable overall.[90] The same is true for Plaintiff's submission of costs. The Court

---

assistants with significant legal responsibilities in the Harrisburg venire of this Court). See also Valenti v. Allstate Ins. Co., 243 F. Supp. 2d 200, 203 (M.D. Pa. 2003) (Mannion, Mag. J.) (setting $50 to $75 per hour rate for legal assistants in the Scranton venire of this Court).

[90] See "AA" and "TPR" entries on 11/2/2010, 12/4/2012, 1/10/2013, and 9/2/2015. For the record, the Court also notes that in conducting its inquiry into Plaintiff's submission of costs and fees, it paid particularly close attention to that portion of the fee amassed in travel, the two 12/3/2015 entries that comprised the two greatest fee entries. The Court ultimately believes that an award of fees for time spent traveling is wholly appropriate here, after the appropriate forum rate revision has been made. See, e.g., Imprisoned Citizens Union v. Shapp, 473 F. Supp. 1017, 1022 (E.D. Pa. 1979) ("Time spent driving from Philadelphia to Dallas, Pennsylvania, is significantly different. Counsel could not delegate to others the task of travelling to interview a plaintiff. Although Mr. Levine need not actually have driven the car, he obviously had to be present. Further, because not chauffeured in a limousine, Mr. Levine's necessary presence precluded him from accomplishing any billable legal work during the trip. This travel time, then, unlike the clerical work in Prandini, could not have been performed at a

finds that each entry on Plaintiff's request for costs is appropriate and reasonable.

Thus, taking into accounting each of the above revisions, Plaintiff's adapted award of fees and costs is as follows:

| Table 2. Plaintiff's Awarded Fees and Costs | | | |
|---|---|---|---|
| **Employee** | **Rate** | **Hours** | **Total** |
| Admin. Assistant | $90.00 | 11.85 | $1,066.50 |
| John R. Brown, Esq. | $325.00 | 11.90 | $3,867.50 |
| Research Attorney | $200.00 | 4.00 | $800.00 |
| Thomas P. Riley, Esq. | $325.00 | 1.90 | $617.50 |
| Costs[91] | - | - | $1,499.16 |
| | | **Total** | **$7,850.66** |

Accordingly, Plaintiff will be awarded $7,850.66 in fees and costs.

### D.   Defendant Mr. Tickle Is Individually Liable For The Entire $12,650.66 Award.

"The rule for vicarious liability under § 553 can be stated . . . as follows: An individual (or business entity) may be held vicariously liable for violating § 553 if he (1) has the right and ability to supervise the violative activity, although he need not actually be supervising, because he need not know of the violative activity, and (2) has a direct financial interest in the violation, i.e., financial benefits, even if not proportional or precisely calculable, that directly flow from the violative

---

lesser expense; further, the trip cost counsel the fees that he could have earned during the hours spent on the road. The impossibility of assigning the task distinguishes <u>Prandini</u> and the lost opportunity for other work convinces me that Mr. Levine's 10 hours a reasonable time for the lengthy drive should be fully included here.").

[91]   Itemized at ECF No. 56 Ex. 2 at 11.

activity."[92] "Courts consider a financial interest to be present when infringing materials act as a draw for customers."[93]

Plaintiff has pled sufficient factual matter to support a finding of vicarious liability here. Plaintiff's Complaint, among other allegations, avers that:

- Defendant Larry W. Tickle, Jr. is an officer of Cafe Bellisimo, Inc. which owns and operates the commercial establishment doing business as Fatty McDaddy's . . . .[94]

- Defendant Larry W. Tickle, Jr. is also one of the two individuals . . . specifically identified on the Pennsylvania Liquor Control Board license issued for Fatty McDaddy's . . . .[95]

- [O]n September 25, 2010, . . . Defendant Larry W. Tickle, Jr. had the right and ability to supervise the activities of Fatty McDaddy's . . . . which included the unlawful interception of Plaintiff's Program.[96]

- [O]n September 25, 2010, . . . Defendant Larry W. Tickle, Jr., as an individual specifically identified on the liquor license for Fatty McDaddy's . . . had the obligation to supervise the activities of Fatty

---

[92] Yakubets, 3 F. Supp. 3d at 296.
[93] DIRECTV, Inc. v. Cibulka, No. 1:11-CV-00231, 2011 WL 3273058, at *1 (M.D. Pa. July 29, 2011) (Conner J.) ("Vicarious liability is proper when the defendant has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.) (internal quotations and citations omitted).
[94] Id. at 2–3, ¶ 7.
[95] Id. at 3, ¶ 8.
[96] Id. at 3, ¶ 11.

McDaddy's . . . .[97]

- [O]n September 25, 2010, . . . Defendant[ ] Larry W. Tickle, Jr. . . . specifically directed the employees of Fatty McDaddy's . . . to unlawfully intercept and broadcast Plaintiff's Program at Fatty McDaddy's . . . or that the actions of the employees of Fatty McDaddy's . . . are directly imputable to Defendant[ ] Larry W. Tickle, Jr. . . . by virtue of [his] acknowledged responsibility for the actions of fatty McDaddy's . . . .[98]

- [O]n September 25, 2010, Defendant Larry W. Tickle, Jr. as an officer of Cafe Bellisimo, Inc. and as an individual specifically identified on the liquor license for Fatty McDaddy's . . . had an obvious and direct financial interest in the activities of Fatty McDaddy's . . . which included the unlawful interception of Plaintiff's Program.[99]

Based on the Court's review of these factual allegations contained in Plaintiff's Complaint, it is evident that the Plaintiff has satisfied both requirements necessary to establish vicarious liability. First, in his official capacity as well as in his capacity as a registrant on his establishment's liquor license, Defendant Mr. Tickle had the "right and ability to supervise" the piracy at issue as a matter of law.

---

[97] Id. at 3–4, ¶ 13.

[98] Id. at 4, ¶ 15.

[99] Id. at 4, ¶ 16.

It is not necessary that Defendant violated the law himself or that he was present for the violation. Based on Defendant's official role at the establishment, he was responsible for the acts of his agents, his bartenders and other staff, and it is enough to hold him vicariously liable to the extent that one of his employees committed the piracy at issue.

Second, Defendant enjoyed "a direct financial interest in the violation." That is to say, the enhanced profits earned from attracting patrons with a bootlegged program were directly related to the profits earned by Defendant's establishment, and by extension, Defendant himself would reap on a given night. That is a mere consequence of everyday business incentives. It is also why lawmakers have enacted anti-piracy legislation: absent such penalties necessary to curb the evident moral hazard of such commercial piracy, the establishment owner would collect an ill-gotten gain, while the program distributor would incur all the costs associated with production and transmission.[100]

---

[100] The Court would distinguish certain other decisions denying full vicarious or personal liability against an establishment's officers in cases brought by this Plaintiff. See, e.g., Yakubets, 3 F. Supp. 3d at 301–02. In the Court's view, those decisions employ an altogether too restrictive view of the extent of damages that may be directly attributable to an officer or director of such establishments in light of an undisputed violation of anti-piracy laws. Those individuals must have an incentive to hire law-abiding employees or else evading anti-piracy laws and attendant vicarious liability for such infringement would be entirely too easy. A direct violation by an officer is traditionally not required in considering vicarious liability in the run of civil cases. Such a stringent requirement is simply unrealistic and would rarely be satisfied in practice. Moreover, the particular facts of this case are such that the entirety of the statutory and enhanced damages are directly attributable, at a minimum, to Defendant Mr. Tickle's agents. Moreover, the costs and fees incurred by Plaintiff are in fact entirely attributable to Mr. Tickle's refusal to comply with the initial settlement agreement and to

## IV.    CONCLUSION

In consideration of the foregoing analysis, Plaintiff's Motion for Default Judgment is granted. Plaintiff is awarded $1,200 in statutory damages, $3,600 in enhanced damages, and $7,850.66 in fees and costs, for a total award of $12,650.66, of which Defendant is personally liable for the entire amount.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge

---

require the Court to reopen this matter. The punitive effect of such liability is therefore entirely appropriate on the facts and procedural history of this case.